## MATTER OF HO

### In Visa Petition Proceedings

### A-22952934

*Decided by Board October 6, 1981*

(1) The People's Republic of China has not promulgated statutes presenting procedural requirements for the establishment of adoption.

(2) There are no known requirements that an adoption, or any written agreement involved, be examined or approved by an agency or official of the government of the People's Republic of China in order to validate an adoption in that country. *Matter of Yee*, 14 I&N Dec. 132 (BIA 1972), clarified.

(3) The procedure for effecting adoptions in the People's Republic of China has not been adequately spelled out in court decisions and other legal writings. *Matter of Yee*, 14 I&N Dec. 132 (BIA 1972), modified.

(4) Where the record in visa petition proceedings provides insufficient evidence of what was required to create a recognized and valid adoption in the People's Republic of China in 1958, and where the petitioner has not provided sufficient evidence to meet the requirements of section 101(b)(1)(E) of the Immigration and Nationality Act, 8 U.S.C. 1101(b)(1)(E), the record is remanded for further proceedings.

ON BEHALF OF PETITIONER:
Joseph S. Hertogs, Esquire
Jackson & Hertogs
580 Washington Street
San Francisco, California 94111

ON BEHALF OF SERVICE:
Jim Tom Haynes
Appellate Trial Attorney

BY: Milhollan, Chairman; Maniatis, Maguire, Morris, and Vacca, Board Members

The District Director has certified to us his new decision dated October 15, 1979, again denying a visa petition filed on behalf of the beneficiary as the petitioner's brother under section 203(a)(5) of the Immigration and Nationality Act, 8 U.S.C. 1153(a)(5). The record will again be remanded.

The 42-year-old female petitioner is a native of the People's Republic of China and citizen of the United States. The beneficiary is a 32-year-old male, a native and citizen of the People's Republic of China. On September 20, 1977, the petitioner filed a visa petition on the beneficiary's behalf, claiming that he is her brother through his adoption by her mother. In support of the petition, the petitioner submitted a document, dated August 10, 1958, entitled "Adoption Agreement." This agreement purports to establish that one Ho Jung Loon gave the beneficiary, his

son, to the petitioner's mother, Wong Ching Kiu, for adoption. In his initial decision dated February 27, 1978, denying the petition, the District Director found that this agreement was insufficient to establish that the beneficiary was, in fact, adopted by the petitioner's mother as it had not been examined and approved by an agency of the Government of the People's Republic of China. In support of his decision, the District Director cited our decision in *Matter of Yee*, 14, I&N Dec. 132 (BIA 1972).

In this respect, we requested a new memorandum of law from the Library of Congress relating to requirements for adoption in the People's Republic of China. In a report prepared by the Far Eastern Law Division of the Library of Congress, dated June, 1981 (see Appendix), it is observed that the People's, Republic of China has not promulgated statutes presenting procedural requirements for the establishment of adoption; hence, any requirements stated by authorities have been derived from policy rather than positive law. Yet, it is further observed, in the People's Republic of China there has never been a distinction between law and policy. The report, on the issue at hand, continued that there are no known requirements that an adoption, or any written agreement involved, be examined or approved by a state agency or official to validate an adoption in the People's Republic of China. According to the Library of Congress report, on January 9, 1958, the Provisions of the People's Republic of China on Household Registration were promulgated. While Article 19 of these provisions states that a change in a person's status due, *inter alia*, to adoption is to be reported by the person involved to the head of the household so that the household register, maintained by the public security organs, will be changed accordingly, there is no indication that the recordation in the household record has any effect on the validity or invalidity of the adoption, or that public security organs are to examine the adoption for conformity to any law or policy. Hence, according to the report, registration with the public security organ cannot be regarded as a procedural requirement for adoption in the People's Republic of China.

In light of the above, we find that there is insufficient proof of what was required to create a recognized and valid adoption in the People's Republic of China in 1958. The 1981 Library of Congress report indicates that adoptions over that period may have been recognized in China even without a writing and approval by a state agency or official, but the Library of Congress report is unable to state what the requirements for an adoption were. To date, the Library of Congress report indicates that the requirements are not clear. Hence, we will remand the record to provide the parties a further opportunity to offer evidence in this regard.

In *Matter of Yee*, *supra*, relying on a memorandum from the Chief of

the Far Eastern Law Division of the Library of Congress, dated January 19, 1972, and adopting that petitioner's contentions, we held, *inter alia*, that the procedure for effecting adoptions in the People's Republic of China had been adequately spelled out in court decisions and other legal writings. Thus, in the light of the current Library of Congress report to the contrary, dated June 1981, our holding in *Matter of Yee*, *supra*, was an overstatement to the extent that it accepts the contentions of that petitioner, *i.e.*, that the procedures for effecting adoptions had been adequately spelled out in court decisions and other legal writing. Therefore, we will recede in that respect from our holding in *Matter of Yee, supra*. Moreover, contrary to the District Director's conclusion, *Matter of Yee* did *not* hold that only adoptions that were examined and approved by the Government agencies would be recognized. It was simply noted that the adoption in that case had been so approved. Therefore, in this respect the District Director's reliance on *Matter of Yee* was misplaced.

In the present case, in support of the visa petition the record contains: (1) adoption agreement dated August 10, 1958, when the beneficiary was a 9-year-old youth, showing that Wong Ching Kiu, the petitioner's mother, agreed to the beneficiary's adoption; (2) Relative Relationship, notarized March 11, 1979, showing that the beneficiary is the adopted son of Wong Ching Kiu, and younger brother of the petitioner, Ho Chui Wah; (3) Relative Relationship Certificate dated February 21, 1979, showing that Ho Chew Huong and Ho Chui Wah are brother and sister by adoption, and, (4) certificate dated February 21, 1978, showing that Ho Chew Huong and Ho Chui Wah are siblings by adoption. While the petitioner asserts in her previous appeal brief, received on March 24, 1978, that the beneficiary resided with the adopted parent for the period prescribed by section 101(b)(1)(E) of the Act, 8 U.S.C. 1101(b)(1)(E), there is no probative evidence on this issue contained in the record. Hence, we find that the petitioner has not presented sufficient evidence to show that the beneficiary was adopted in 1958, and had resided with the adopting parent for at least 2 years as required under section 101(b)(1)(E) of the Act. Therefore, it has not been established that the beneficiary qualifies as a "child" under section 101(b)(1)(E) of the Act to be eligible for immigration benefits under section 203(a)(5) of the Act.

Consequently, in the light of all of the foregoing, we will remand the record as presently constituted to the District Director. On remand the petitioner may present additional evidence in support of her visa petition. *See also Matter of Kwan*, 14 I&N Dec. 175 (BIA 1972); *Matter of Chin*, 14 I&N Dec. 150 (BIA 1972). Additional evidence, preferably in the form of her affidavit or that of her mother, Wong Ching Kiu, the beneficiary's adopted mother, who was admitted as a lawful permanent

resident in 1968, is required to establish that the beneficiary is the child of Wong Ching Kiu under section 101(b)(1)(E) of the Act to establish eligibility for preference status for the beneficiary under section 203(a)(5) of the Act. The 2-year requirement with respect to residence may include periods of residence accumulated prior to formal adoption. *Matter of M-,* 8 I&N Dec. 118 (BIA 1958, A.G. 1959). Thereupon, the District Director will adjudicate anew the visa petition and render a new decision.

On remand, the burden of proof remains with the petitioner to establish eligibility for the benefits sought. *See Matter of Brantigan,* 11 I&N Dec. 493 (BIA 1966). This includes the petitioner proving the contents of foreign law upon which she relies, since foreign law remains a question of fact to be proved. *See Matter of Annang,* 14 I&N Dec. 502 (BIA 1973).

**ORDER:** The record is remanded.

## APPENDIX

### ADOPTION IN THE PEOPLE'S REPUBLIC OF CHINA

The People's Republic of China has not adopted a civil code, although a draft of such a code apparently is being circulated. To the best of our knowledge, no outsider has seen this draft. We believe that adoption will be one of the legal actions/relationships covered in any civil code that the People's Republic of China (PRC) adopts; however, we also believe that such a code, if and when adopted, will cover adoption in terms *much* more general than those appearing in U.S. legislation.

To the best of our knowledge, the PRC still has not promulgated statutes presenting substantive and/or procedural requirements for the establishment or termination of adoption, nor has it made any but the most general statutory provision for the nature of the adoption relationship.

Various "requirements" for adoption have been mentioned since the 1950s in primary sources on adoption in the PRC. but, as we discuss below, these "requirements" apparently derive from policy rather than positive law. In the PRC there has never been a distinction between law and policy as clear as that made in the West between the two.

Article 1 of the 1950 Marriage Law of the People's Republic of China provided that "[t]he New-Democratic marriage system, which is based on the free choice of partners, on monogamy, on equal rights for both sexes, and on the protection of lawful interests of women and children, shall be put into effect." The comparable statement in article 2 of the 1980 Marriage Law provides more simply that "[t]he lawful rights and interest of women, children and the aged are protected."

In a commonly used English translation, article 13 of the 1950 Marriage Law provided that:

> [p]arents have the duty to rear and educate their children the children have the duty to support and to assist their parents. Neither the parent nor the children shall maltreat or desert one another.

> The foregoing provision also applies to foster-parents and foster-children. Infanticide by drowning and similar criminal acts are strictly prohibited.

The Chinese terms that have been translated here as "foster-parents" and "foster-children" are "*yang fu-mu*" and "*yang tzu-nu.*" As we stated previously, the English translations of these terms that have been accepted in general usage are "adoptive parents" and "adopted children." This statement in article 13 about "foster-parents" and "foster-children" was the only direct reference to adoption in the 1950 Marriage Law.

In an unofficial translation of its text published in the quasi-official *Beijing Review*, article 20 of the 1980 Marriage Law provides that:

> [t]he state protects lawful adoption. The relevant provisions in this law governing the relations between parents and children are applicable to the rights and duties in the relations between foster-parents and their foster-children.

> The rights and duties in the relations between foster-children and their natural parents are terminated on the establishment of relationship of adoption [sic].

Again, the translators have rendered "*yang fu-mu*" and "*yang tzu-nu*" as "foster-parents" and "foster-children."

We are enclosing a copy of a draft of a letter that we used in 1971 to argue that the translators of the 1950 Marriage Law, in using the terms "foster-parents" and "foster-children," may have done so in order to cover a range of relationships somewhat broader than that encompassed in the term "adoption." Such may have been the purpose of the selection of the terms "foster-parents" and "foster-children" in the translation of the 1950 Marriage Law and also the 1980 Marriage Law. There also is the possibility, which we are not in a position to dismiss, that use of the terms "foster-parents" and "foster-children" in the translation of the 1950 Marriage Law was a mistake arising from the translators insufficient knowledge of the English language and/or Western law; there is the further possibility that this mistake was duplicated in the translation of the 1980 Marriage Law because its translators were guided by the existing translation of the 1950 Marriage Law.

Regardless of the reasons for use of the terms "foster-parents" and "foster-children," there still is no question in our minds that the statements about "foster-parents" and "foster-children" in both the 1950 and the 1980 laws apply to "adoptive parents" and "adopted children." Indeed, article 13 in the translation of the 1980 Marriage Law is very puzzling if one assumes that not all of it deals with adoption. We have no doubt that all of article 13 applies to adoption.

The only other Chinese statutes dealing with adoption of which we

are aware and to which we have access are two enactments dealing with household registration. Since these two enactments date from the 1950s, we first will present a resolution on the status of past laws adopted by the Standing Committee of the National People's Congress on November 29, 1979. We are quoting this resolution as it appears in English translation in *Foreign Broadcast Information Service, Daily Report, People's Republic of China*, November 30, 1979, p. L3-L4. The resolution states that:

> To strengthen and perfect the socialist legal system and to insure the smooth progress of the socialist modernization drive, it is hereby decided, in accordance with the guidelines of the resolution on the validity of the PRC's existing laws and decrees adopted by the first session of the 1st NPC in 1954, that the laws and decrees approved and enacted by the former central people's government since the founding of the PRC on 1 October 1949 and the laws and decrees formulated and approved by the NPC and its Standing Committee since the establishment of the PRC Constitution by the first session of the 1st NPC on 20 September 1954, shall remain in effect except for those which are in conflict with the Constitution and laws formulated by the 5th NPC and those which are in conflict with the decrees formulated and approved by the Standing Committee of the 5th NPC.

The First Session of the Fifth National People's Congress of the People's Republic of China conven ˉ in Beijing from February 26 to March 5, 1978. The resolution does not indicate what body is to decide if a past law is in conflict with an enactment of the Fifth National People's Congress or its Standing Committee nor how "in conflict" is to be interpreted. We have not seen primary materials discussing these issues.

The Instruction of the State Council on the Establishment of a Regular System of Household Registration was approved by a Plenary Session of the State Council on June 9, 1955, and its Chinese text appears in *Zhonghua Renmin Gonghekuo fagui huibian* [Compilation of the Laws and Regulations of the People's Republic of China], v. 1, Beijing, Falu chubanshe [Legal Press], 1956, p. 197-200. The opening paragraph of this instruction states:

> The 1953 work of investigating and registering the population has already founded and consolidated a basis for establishing a regular system of household registration. At present that system has already begun to be established in the majority of the areas of the country or the necessary preparations are proceeding.

The instruction continues:

> Administration of household registration throughout the country will be managed by the Ministry of Internal Affairs and the civil administration departments of the people's councils at the county [xian] level and above. The organs that handle household registration will be the public security substations in the municipalities and market towns and the village and town people's councils in the towns and the market towns that have not established public security substations.

Later, the Instruction states:

> Changes in household registration due to marriage, separation of the members of a household, formation [or reunion of the members] of a household, a missing person, the return of a missing person, adoption, acknowledgment, hiring or ending employment,

etc., all should be reported by the head of the household or the person involved to the people's committee of the local market town or town or reported to the responsible person of the administrative organization of the local market town or town so that he can transmit the information to the people's committee of the market town or town for registration or recordation in accordance with the provisions on leaving and entering the area.

On January 9, 1958, the Provisions of the People's Republic of China on Household Registration were promulgated. The Chinese text of these provisions appears in *Zhonghua Renmin Gongheguo fagui huibian* [Compilation of the Laws and Regulations of the People's Republic of China], v. 7, Beijing, Falu chubanshe [Legal Press], 1958, p. 204-208. Article 19 of these provisions states that a change in a person's status due to marriage, divorce, adoption, etc., is to be reported by the person involved or the head of the household so that the household register will be changed accordingly. The provisions stipulate that the household register is to be maintained by the public security organs of various levels. They do not indicate that recordation in the household register has any effect on the validity or invalidity of an adoption, nor do they state that the public security organs are to examine the adoption for conformity to any law or policy.

In a discussion of adoption that we included in translation in the 1970 report, the Communist Chinese jurist Ma Ch'i indicated that when the organ in charge of family [household] registration receives a request for registration, it "carefully examines the conditions for adoption and the pertinent proof" and registers the adoption "when it finds it to be lawful." We underline the fact that, as far as we know, there is no statute that requires the public security organ to make such an examination or which states the criteria according to which the public security organs can decide whether an adoption is lawful; hence, registration with the public security organ cannot be regarded as a procedural requirement for adoption in the sense in which "procedural requirement" is used in American law. In his discussion of adoption, Ma Ch'i himself includes a lengthy section on the recognition of adoptions that have not been registered or notarized or otherwise officially sanctioned.

Insofar as we can determine, the "requirements" for establishing adoption stated in some of the primary materials we have translated and forwarded with this report are based upon the authors' knowledge of policies being followed at the time they were writing. We have not had access to any statute that formally and publicly presents any of the "requirements" that are discussed in these materials, nor do we know of the existence of any such statute. We note also that none of the authors clearly cites any statute in which these requirements appear. We have used the words "clearly cites" because one of the primary sources we have enclosed—the translation of a comment on adoption that appeared in the "Legal Advice" section of *Minzhu yu fazhi* [Democracy and Legal

System], No. 1, 1981, p. 48—refers to the "Provisions on the Handling of the Transfer of Household Registration." As we have noted on this translation, we have not been able to locate the text of or any other reference to these provisions. Also, it is not clear in the sentence in which these provisions are mentioned that the requirement the authors are discussing appear in the "Provisions on the Handling of the Transfer of Household Registration." The authors refer to these provisions and "the spirit of [other] relevant provisions." In the Chinese, it is not clear whether the "[other] relevant provisions" are found in statutes or policy statements. We point out, however, that Communist Chinese officials are known to have had access in the past to unpublished guidelines and at present may have unpublished laws or policy statements on adoption. The PRC has only recently resumed legal publication after a decade during which extremely few publications appeared.

Policy has played a major role in adoption in the PRC. There are many reasons why this has been the case. One is the fact that the Communist Chinese have never embraced the concept that legality is of the highest importance and that legality consists of conformity to preexisting statutory criteria. Another is the fact that the process of establishing judicial organs that could handle adoption has been slow and uneven in a country as vast, populous, and diverse as China. A third important consideration has been the government's recognition that the process of developing awareness of law and policy among the people also has been slow and uneven in view of China's historical legacy of poverty, illiteracy, and entrenched customs. A fourth factor has been the necessity of making allowances for the effects which the severe disruptions during the Cultural Revolution of the 1960s had upon the people. Part of those disruptions was the virtual paralysis of the judicial organs and official denunciation of law and legality.

Policies have varied widely from time to time and place to place. Further, even when there has been a relatively specific policy, the strictness or thoroughness with which it has been enforced has varied widely.

Against this background, it is helpful to discuss the distinction that Ma Ch'i makes between "adoption as a legal act" and "adoption as a fact." Because the distinction made in the West between *de jure* relationships and *de facto* relationships is predicated upon the existence of statutes according to which *de jure* relationships can be established, it is misleading to use these two Latin terms in the Chinese context, for in many instances there have been no statutes according to which a *de jure* relationship could be established. It is apparent that at the time that Ma Ch'i wrote, and, we assume, for many years after, the Communist Chinese were recognizing adoptions that existed "as a matter of fact." We think that Ma Ch'i makes the best statement of the circumstances in

which adoption "as a matter of fact" would be recognized when he indicates that "[w]hether or not adoption has been established should be individually ascertained, taking into consideration the concrete facts."

We believe that prominent among the concrete circumstances the authorities would consider in deciding upon sanctioning an adoption would be the time the adoption was established, the policies prevailing at the time, the parties' awareness of policy and law, the availability of judicial personnel, and, above all, whether the adoption was in the interest of the child.

In reading Ma Ch'i's discussion of the establishment of adoption and other primary sources we have forwarded with this report, it also is apparent that Communist Chinese officials have been directed to focus more upon whether an adoption violates a known law or important policy than upon whether it fulfills pre-existing criteria. For example, since the Communist Chinese have opposed the sale of children, the authorities most likely would reject an adoption if it was clear that a child had been sold to an adopter who was supporting him or her only in order to gain from his or her labor.

Policy enters into adoption in the PRC in yet another way. It is apparent that policies will be applied to adoption for reasons other than strictly legal considerations. For example, in one of the primary sources that we have forwarded, the editors of *Minzhu yu fazhi* indicate that strict controls are being placed upon the adoption of a peasant child by an urban resident. (See the editors' response to a question on adoption presented in *Minzhu yu fazhi*, No. 1, 1981, p. 48.) This policy is a reflection of Beijing's longstanding, general policy of controlling the urban population. Enforcement of this policy has been essential in a country in which the vast majority of citizens live in the rural areas, in which job opportunities in the cities have been extremely limited, and in which peasants generally believe that urban residents have an easier and more materially abundant life and much greater opportunities to advance. Imposing strict conditions on the circumstances under which an urban resident can adopt a peasant child is obviously designed to prevent adoptions intended solely to gain an urban life for a rural child, for, if such adoptions were permitted, there no doubt would be an influx of peasant children into the cities through adoption.

The ability and desire of the authorities to impose legal or policy control over adoption have increased over the years. In view of Beijing's recent policy of strengthening the legal system, the heightened awareness of the people of the advantages of having actions such as marriage and adoption officially examined and ap proved before the fact, and the increased ability of the government to enforce its laws and policies, we believe that there will be a trend toward some form of official involvement in the establishment of adoption. However, we think it extremely

improbable that PRC officials will begin invalidating adoptions established before the late 1970's solely on the grounds that the parties involved did not follow certain procedures or that the adoption does not have certain characteristics in substance. We believe that in many instances even those established in the 1970's or later will still be individually considered rather than accepted or rejected solely on the basis of conformity or non-conformity to pre-existing procedural or substantive criteria. Judging from the unevenness of the enforcement of the Criminal Code that entered into force in the PRC on January 1, 1980, we beli've that even the adoption of a civil code containing provisions on adoption will not have an immediate and radical effect on adoption.

With respect to the question of whether both the natural parents and the adoptive parent must sign a written adoption agreement, we know of nothing that enumerates the signatures required on a written adoption agreement, if a written agreement is or has been used. The article on the public notary system that we have enclosed indicates that a testator must sign his will in the presence of a notary, but it says nothing about adoption agreements.

With respect to the age of consent and any requirement that a child of that age also must sign the adoption agreement, we have no information that is based upon laws or regulations. In 1957 a group of Chinese jurists wrote a group of lectures that eventually appeared under the title *Basic Problem in the Civil Law of the People's Republic of China.* Soon after the appearance of this book, many of the views expressed therein came under serious criticism in the anti-rightist campaign. This book never had a status higher than that of reference material, and more than two decades have passed since its publication. Nonetheless, we are enclosing its section on the "General Concept of the Subject of Civil Juristic Relations," which includes discussion of disposing capacity. Nothing in this section is of a definitive nature, and we intend it only for use as reference material. In our 1970 report, the discussion of adoption by Ma Ch'i includes a statement that the PRC had not established the age at which a child must sign the agreement for his adoption, but that the Soviet Union's use of 10 years of age as the age at which the consent of the child must be obtained could be used "as a reference." The translation we have enclosed of a comment on adoption that appeared in issue No. 1 for 1980 of the new Communist Chinese legal journal *Minzhu yu fazhi* [Democracy and Legal System] states that "men and women who have attained their majority, according to policy and the provisions of law, may take and rear the son and daughter of another person as their own son or daughter." Specifically what the author had in mind in saying "men and women who have attained their majority, according to policy and the provisions of law" is unclear, as we know of no policy statement or legal provision in which the PRC has given a general definition of the

age of majority. We believe that a definition of the age of majority will appear in the civil code that apparently is being circulated now in draft form.

In light of this background, we emphasize that the 1980 Marriage Law's provision that the state protects "lawful adoption" lacks the clarity of meaning that such a statement would have in American law.

To assist you in evaluating the significance of a notarial certificate and birth certificate issued in the PRC in 1979, we are enclosing our translation of an extensive article on the PRC's notarial system that appeared in the Communist Chinese journal *Faxue yanjiu* [Studies in Law], No. 3, 1980, p. 44-46. While this article makes it apparent that the public notary is expected to take great care in deciding upon the truthfulness of the statements made in documents he notarizes, and the lawfulness of the action involved, it also indicates that notarization only establishes reliability, not necessarily legal validity. The author indicates that:

> [i]f the actions and facts were not certified by the public notary at the time that they occurred, and it is not possible after the fact to differentiate between their truth or falsity and their lawfulness or unlawfulness and a dispute develops, then the only thing to do is to have the court render a judgment in accordance with the procedure for litigation.

In view of the extremely low level of involvement of the Chinese courts in personal status questions and, indeed, in civil cases in general, we believe that a general requirement that an adoption involving a Communist Chinese citizen be validated by a PRC court would be unrealistic.

The article on the notarial system stresses the value of having actions with a legal significance notarized at the time of their occurrence; however, we know of no law or regulation that requires that an adoption agreement be notarized at the time of its conclusion in order for the adoption involved to be valid. In fact, as the materials in the 1970 report indicate, to the best of our knowledge, there is not even a statutory requirement that an adoption must be effected in writing. We also know of no requirement that an adoption or any written agreement involved be examined or approval by a state agency or official in order to make the adoption a valid one. Finally, the article makes it apparent that during long periods in the PRC's history there has not been a functioning notarial system or there has been only a notarial system that concerned itself with matters other than questions of personal status.

We also are enclosing our translation of a section on notarial certificates that appeared in *Zhongguo shouce* [China Handbook], Hong Kong, Ta Kung Pao, 1979, p. 185; the publisher of this work has close ties to the PRC. An English version of this work was issued by the same publisher in 1980 under the title *China Handbook*. We have enclosed a copy of the section on notarial certificates that appears in this English version. You will note that there are differences between the English

and Chinese versions. Specifically, the English version refers to "Chinese regulations" dealing with the issuance of notarial certificates needed in foreign lands or Hong Kong and Macao. We have no information on such regulations other than this statement itself. We are aware that officials in the PRC have had access to other instances to unpublished guidelines.